*FOR PUBLICATION*

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

In re                                    )     Case No.  09-90311-E-7
                                         )     Docket Control No. GMW-3
BRIAN CARROLL and                        )
PATTY CARROLL,                           )
                                         )
                Debtors.                 )
_____  )

**MEMORANDUM OPINION AND DECISION**

Patricia Carroll, a co-debtor in this case ("Debtor"), filed her Motion for the court to "Determine Product Liability Settlement Is Not Property Of The Bankruptcy Estate."  Motion, Dckt. 75.[1]  Debtor has filed the declarations of her attorney (Dckt. 77) and herself (Dckt. 78) in support of the Motion.  In addition, Debtor has filed as documentary evidence the FDA July 2011 Urogynecologic Surgical Mesh Update in support of the Motion.  Dckt. 79.

Michael McGranahan, the Chapter 7 Trustee ("Trustee"), filed his Opposition to the Motion. Dckt. 87.  Additionally, three declarations were filed in opposition to the Motion: Declaration of Trustee's Counsel (Dckt. 88), Declaration of Trustee (Dckt. 89), and Declaration of Counsel for Class Action Settlement (Dckt. 90).  The Trustee filed documentary evidence opposing the Motion and asserting the interests of the bankruptcy estate in this case ("Bankruptcy Estate") in the claims,

---

[1]  Sufficient Notice Provided.  The Proof of Service states that the Motion and supporting pleadings were served on Debtor, Debtor's Attorney, Chapter 7 Trustee, creditors, parties requesting special notice, and Office of the United States Trustee on January 3, 2018.  By the court's calculation, 29 days' notice was provided.  28 days' notice is required.  All parties served have responded.

1    which included the Debtor's Schedules, Class Action Settlement documents, and the  FDA July

2    2011 Urogynecologic Surgical Mesh Update (same as submitted by Debtor).  Dckt. 91.

3         Debtor responded, presenting rebuttal evidence in the form of a second Declaration by

4    Debtor's counsel. Dckt. 96.  Debtor submitted additional rebuttal documentary evidence consisting

5    of a May 9, 2017 Decision of the District Court for the Eastern District of New York and a second

6    copy of the FDA July 2011 Urogynecologic Surgical Mesh Update (authenticated by Debtor's

7    counsel's supplemental declaration).  Dckt. 97.

8         Upon review of the evidence presented and determination of applicable law, this court

9    determines that the rights and claims which are the subject of the Class Action Settlement, and the

10   Class Action Settlement Proceeds thereof, are property of the Bankruptcy Estate in this case.

11   11 U.S.C. § 541(a).  Further, such determination is without prejudice to Debtor claiming exemptions

12   in said property of the Bankruptcy Estate[2] or the Trustee objecting to such claim of exemption.

13

14                        **CORE MATTER PROCEEDING AND**
                          **PROPER ADJUDICATION PROCEDURE**

15        The Motion presents the court with a core matter proceeding – determination of property of

16   the bankruptcy estate pursuant to 11 U.S.C. § 541.  28 U.S.C. §§ 1334 and 157, and the referral of

17   bankruptcy cases and all related matters to the bankruptcy judges in this District.  E.D. Cal. Gen.

18   Order 182, 223.  The Supreme Court provides in Federal Rule of Bankruptcy Procedure 7001 that

19   an adversary proceeding is necessary to determine the issues presented.   In their respective

20   declarations, counsel for Debtor (Declaration ¶ 5, Dckt. 77) and counsel for the Chapter 7 Trustee

21   (Declaration ¶ 19, Dckt. 88) state that they and their clients consent to have these interests and rights

22   adjudicated as a contested matter.

23        At the February 1, 2018 hearing, the court addressed this procedural issue with the parties.

24   At said hearing, both Parties confirmed on the record that they consented to the determination of

25   their clients' respective interests in the property at issue in this contested matter, waiving the right

26   to have those interests adjudicated in an adversary proceeding.  Such waiver by the parties, electing

27

28
     _____
          [2]  11 U.S.C. § 522.

to proceed by contested matter proceeding is permissible. *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 763 (5th Cir. 1995); 10 Collier on Bankruptcy P 7001.01, FN. 10.

The court concurs with the election by the Parties to proceed by contested matter. Both are represented by experienced, knowledgeable counsel. No prejudice exists for either Party, nor the court, out of the election.

**ISSUES PRESENTED AND POSITIONS**
**ADVANCED BY THE PARTIES**

The Debtor requests that this court determine that the product liability settlement proceeds, flowing from a transvaginal mesh patch implant (the "Device"), which claim is now listed on Amended Schedule B, are not property of the Bankruptcy Estate. The Class Action lawsuit (Debtor was not the class action plaintiff, but subsequently determined to be a class member) has resulted in the claims and rights at issue having a value of $240,000.00 – the "Class Action Settlement Proceeds" distribution for Debtor's claim. Debtor has now claimed an exemption of $240,000.00 pursuant to California Code of Civil Procedure § 704.140 in the Class Action Settlement Proceeds on Amended Schedule C. Dckt. 54.

Debtor's bankruptcy case was filed on February 6, 2009, with Debtor receiving her discharge on May 19, 2009 (Dckt. 31). Debtor relates that she had a transvaginal mesh patch implanted on August 22, 2003 (five and one-half years prior to the bankruptcy case being filed), which resulted in subsequent medical issues, leading to Debtor pursuing her rights to the class action recovery in 2015. Dckt. 78.

Debtor argues that she did not "know" about any "legal claim" that was available to her until 2014, and as such, the claim was not "sufficiently rooted" in her prepetition past such that it would be an interest of the Bankruptcy Estate. Debtor argues that her claim did not accrue until 2014 when she learned of a United States Food and Drug Administration ("FDA") warning and when she subsequently that year learned about being able to sue the manufacturer of her transvaginal mesh patch.

Therefore, Debtor argues that the settlement proceeds are not part of the Bankruptcy Estate in this case and requests that the court issue an order holding the same.

**Debtor's Authorities and Arguments**

Debtor's legal basis for this argument begins with citing to *Butner v. U.S.*, 440 U.S. 48, 55 (1979), for the basic proposition that while determination of what is property of a bankruptcy estate arises under the Bankruptcy Code, the federal judges look to state law or other applicable non-bankruptcy law to make the determination of interests in property.    Specifically, Debtor asserts that the federal court shall look to state law to determine when a claim "accrues," and that the property of the bankruptcy estate pursuant to 11 U.S.C. § 541 consists only of the interests of Debtor as of the commencement of the bankruptcy case.

Focusing on the assertion that as of the commencement of the bankruptcy case no claim had "accrued" for Debtor, and therefore no claim could exist for purposes of 11 U.S.C. § 541(a) to make it property of the Bankruptcy Estate, Debtor directs the court to California Code of Civil Procedure § 312, which provides:

> § 312. Commencement of civil actions
>
> Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute.

As addressed at the hearing, this is the general rule governing civil actions requiring them to be timely prosecuted. Debtor focuses on the use of the word "accrued" in this provision setting forth the general rule against the presenting of stale claims arising under California law.

Debtor's discussion continues, directing the court to the proposition that a cause of action does not accrue (for purposes of the running of the statute of limitations on bringing an action) until all of the elements of the claim exist. Debtor directs the court to *Norgart v. Upjohn*, 21 Cal. 4th 383 (1999) for the proposition that no cause of action "accrues," so therefore no cause of action could "exist," so therefore there could be no cause of action to become property of the Bankruptcy Estate, and therefore Debtor's claims arising from the prepetition medical treatment with the Device could not be property of the Bankruptcy Estate, but are all Debtor's post-petition assets.[3]

---

[3] As discussed below, the California Supreme Court in *Norgart* was not addressing the issue of whether rights had arisen or a claim existed, but "whether the Norgarts' causes of action for wrongful death were barred by the statute of limitations, . . . ." *Norgart v. Upjohn*, 21 Cal.

In responding to the Trustee's Opposition, Debtor advances her case by pressing the Delayed Discovery Rule.[4] Debtor argues that she did not become aware of the potential defective nature of the pelvic mesh device until 2014. Reply, Dckt. 94. Debtor argues that after consulting with an attorney in 2005 about the device, she was informed by that attorney that there was no factual or legal basis to believe that the mesh implant was defective at that time, meaning that she had no knowledge of a viable claim. Therefore, because Debtor asserts she did not know of a claim, then no claim could have existed when this case was filed because the running of the statute of limitations was tolled under the Delayed Discovery Rule.

Debtor agrees with the Chapter 7 Trustee's reading of *In re Goldstein* that the Bankruptcy Appellate Panel "found that if a claim could have been [brought], it has accrued." Debtor contends that no claim could have been brought because she did not know she had a claim when the bankruptcy case was filed. Debtor believes that it is the existence of the July 2011 FDA Update that caused her to "know" of a claim, thus the claim cannot exist before July 2011.

It appears that Debtor asserts an "all for me and nothing for you" position, contending that all of the claims and rights, from which the Class Action Settlement Proceeds flow, are either: (1) Debtor's post-petition property because Debtor asserts that she did not have "knowledge" of such rights or possible claim; or (2) Bankruptcy Estate Property if the claims existed prepetition. As presented by Debtor, the existence or non-existence of the claim, rights, and Class Action Settlement Proceeds turns on the Debtor's personal, non-legal, "knowledge" of the law and the existence of such existing, enforceable rights.

## CHAPTER 7 TRUSTEE'S OPPOSITION

Michael McGranahan (the "Chapter 7 Trustee") filed an opposition on January 17, 2018. Dckt. 86. The Chapter 7 Trustee alleges that determination of whether the settlement proceeds are property of the estate will depend on the date Debtor's claim accrued. *Id.* at 4:17–18.

The Chapter 7 Trustee concurs that determination of the interests in the claim is a matter of

---

4th at 394-95.

[4] Delayed Discovery Rule, *infra*.

5

1   state law, not federal law. *Id.* at 4:18–19 (citing *Goldstein v. Wells Fargo Bank, N.A. (In re*

2   *Goldstein)*, 526 B.R. 13, 21 (B.A.P. 9th Cir. 2015)). He argues pursuant to California case law that

3   a cause of action—under the Delayed Discovery Rule—begins to run once "plaintiff has reason to

4   suspect an injury and a wrongful cause, unless the plaintiff pleads and proves that a reasonable

5   investigation at that time would not have revealed a factual basis for that cause of action." *Id.* at

6   5:8–11 (citing *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797 (2005)).

7          The Chapter 7 Trustee bases his contention that the claim "accrued" prepetition based on

8   a number of dates and events disclosed by the Debtor:

9          A.     August 22, 2003, mesh implantation;

10         B.     October 8, 2003, excision of exposed section of mesh implant;

11         C.     June 10, 2005, excision of pelvic foreign body and repair of implant; and

12         D.     November 14, 2005, excision of mesh pieces and clips.

13         The Chapter 7 Trustee argues that Debtor knew or suspected that she had a claim around

14  2005 when she first consulted an attorney. *See* Exhibit to Amended Schedule B, Dckt. 54 (stating

15  that "wife consulted an attorney regarding a possible claim" around 2005).

16         Thus, the Chapter 7 Trustee would appear to cede to Debtor that the only issue being

17  presented to the court in determining the interests in the claim for the prepetition medical treatment

18  with the Device is when it "accrues" for purposes of computing the (procedural) statute of

19  limitations under California law.[5]

20         The Chapter 7 Trustee relies heavily on the Bankruptcy Appellate Panel's ruling in

21  *Goldstein v. Wells Fargo Bank, N.A. (In re Goldstein)*, for a similar legal scenario about a legal

22  claim becoming available post-petition based on prepetition facts. In that case, the Bankruptcy

23  Appellate Panel rejected the debtor's contention that his claim did not accrue until post-petition

24  when he learned certain facts. Instead, the Panel focused on California law holding that accrual

25

26         [5] As discussed below, both the Debtor and Chapter 7 Trustee have leaped from the pier
    to chase the red herring word "accrues," as it is used for purposes of state law procedural
27  limitations on parties bringing stale litigation, treating that as determinative of whether the
    Debtor had substantive rights and a claim that became property of this Bankruptcy Estate upon
28  the commencement of this Bankruptcy Case.

1    happens "upon the occurrence of the last element essential for the cause of action." 526 B.R. at 21

2    (citing *Howard Jarvis Taxpayers Assn. v. City of La Habra*, 25 Cal. 4th 809, 815 (2001)).

3          The Chapter 7 Trustee argues that all of the necessary facts for Debtor's products liability

4    claim arose between 2003 and 2005, prepetition.  Therefore, any settlement proceeds from her

5    products liability lawsuit are property of the Estate.

6                    **CHAPTER 7 TRUSTEE'S OBJECTION TO EXHIBIT A**

7          The Chapter 7 Trustee filed an Objection to Exhibit A on January 17, 2018. Dckt. 87.  He

8    argues that Exhibit A (FDA safety notice) has been introduced without any evidentiary basis and

9    has not been properly authenticated in violation of Federal Rule of Evidence 901.  Further, the

10   Chapter 7 Trustee argues that Debtor is not a medical specialist or expert who can introduce the

11   FDA safety notice as part of her expert opinion by Federal Rules of Evidence 702 through 706.  He

12   also argues that the document is hearsay under Federal Rule of Evidence 801 to which no exception

13   applies.

14         In her  Declaration, Debtor bases her testimony on personal, first-hand knowledge and does

15   not present herself as an expert witness.  Her Declaration contains one reference to the FDA safety

16   notice filed as Exhibit A; Debtor states that "[i]n or about 2014 I learned that in July 2011 the FDA

17   issued certain warning orders about the use of the mesh implant (See Exhibit 'A')." Dckt. 78 at

18   3:13.5–14.5.  Debtor does not give any other reference to the exhibit, not even saying that she read

19   it and learned about any defect.  Instead, Debtor testifies that she learned about the mesh implant

20   defect "when [she] was contacted by an attorney in 2014 about representing [her] regarding any

21   potential claim [she] had." *Id.* at 3:14.5–15.5.

22         Debtor's statements are not in the form of authenticating evidence.  She does not even state

23   that she is the one who obtained a copy the FDA safety notice provided as an exhibit.  She appears

24   to allege that the statements within the report are true (hearsay), but her counsel does not present any

25   argument in the Motion for a hearsay exception to apply.  Even after the Chapter 7 Trustee filed his

26   Objection, Debtor and her counsel have not responded.  The court finds that Debtor's Exhibit A has

27   not been properly authenticated in violation of Federal Rule of Evidence 901, and it contains hearsay

28   statements that have not been presented under an exception to Federal Rule of Evidence 801.  The

1  court does not address the Exhibit's admissibility under Federal Rules of Evidence 702 through 706

2  because Debtor does not hold herself out as an expert witness.

3        The Objection to Exhibit A is sustained and Debtor's Exhibit A is not admitted into

4  evidence.

5        However, the Trustee has submitted the same July 11, 2011 FDA Update on Safety and

6  Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse. Trustee's Exhibit A, Dckt. 91,

7  pp. 38-52. This is the same document as Debtor's Exhibit A that is the subject of the above

8  objection by the Trustee. Debtor's Exhibit A, Dckt. 79, pp. 2-16; resubmitted as Debtor's Exhibit B,

9  Dckt. 97, pp. 10-24.

10       Debtor has not objected to the admission of Trustee's Exhibit A, the July 11, 2011 FDA

11 Update on Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse, and the

12 July 11, 2011 FDA Update is admitted into evidence for the Trustee.

13                                    **DISCUSSION**

14 **FDA Update**

15       Both Parties direct the court to the July 11, 2011 FDA Update on Safety and Effectiveness

16 of Transvaginal Placement for Pelvic Organ Prolapse (having been presented to the court three times

17 by both Debtor and Chapter 7 Trustee). This 2011 FDA publication states that it is an **Update** of

18 information previously communicated by the FDA. Title Page to FDA "Urogynecologic Surgical

19 Mesh: **Update** on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ

20 Prolapse." Chapter 7 Trustee's Exhibit A, Dckt. 91, pp. 38-52; and Debtor's Exhibit B, Dckt 97,

21 pp. 10-24 (emphasis added). This Update begins with an Executive Summary which includes the

22 following information:

23        I. EXECUTIVE SUMMARY

24        **In October 2008**, the FDA issued a Public Health Notification (PHN) **to inform**
          clinicians and **patients** of **adverse events related to** urogynecologic **use of surgical**

25        **mesh**, and to provide recommendations on how to mitigate risks and how to counsel
          patients. Following the PHN, the FDA continued to monitor the outcomes of

26        urogynecologic use of surgical mesh. A search of the FDA's Manufacturer and User
          Device Experience (MAUDE) database from the last 3 years (January 1, 2008-

27        December 31, 2010), identified 2,874 Medical Device Reports (MDRs) for
          urogynecologic surgical meshes, including reports of injury, death, and malfunctions.

28        Among the 2,874 reports, 1,503 were associated with pelvic organ prolapse (POP)

                                            8

repairs, and 1,371 were associated with stress urinary incontinence (SUI) repairs.

The FDA also conducted a systematic review of the scientific literature to learn more about the safety and effectiveness of POP and SUI using surgical mesh. The FDA determined that (1) serious adverse events are NOT rare, contrary to what was stated in the 2008 *PHN*, and (2) transvaginally placed mesh in POP repair does NOT conclusively improve clinical outcomes over traditional non-mesh repair.

The FDA is providing this update to advise the public and the medical community of complications related to transvaginal POP repair with mesh. The FDA plans to convene an advisory panel meeting of outside experts in September 2011 to discuss these findings and the types of clinical studies necessary to better assess the risks and benefits of using mesh to treat POP and SUI. In addition FDA is considering regulatory changes that may improve our understanding of the safety and effectiveness of this device.

The FDA continues to evaluate the effects of using surgical mesh for the treatment of SUI and will report about that usage at a later date.

*Id.*, p. 12 (emphasis added).

Neither the Debtor nor Trustee has provided the court with a copy of the 2008 public notice by the FDA.

The 2011 Update does tell us that it is updating information from an October 2008 FDA Public Health Notification to inform clinicians and patients of adverse events related to urogynecologic use of surgical mesh, and to provide recommendations on how to mitigate risks and how to counsel patients. Thus, as of 2008 the information was publically available to both doctors and patients of the "adverse events" relating to the medical treatment with the Device that was performed on Debtor. The 2011 Update states that the prior treatment did cause serious medical events.

**Confusion of Property of the Estate, the Obtaining of Rights,
and the Commencement of the Running of the Statute of Limitations**

Much argument between the parties exists over when the cause of action "accrues" for purposes of the computation of the California statute of limitations on filing a complaint to enforce the rights – as opposed to the real question, when do rights come into existence such that they become property of the bankruptcy estate as provided in 11 U.S.C. § 541. Though Debtor provides only a short reference to federal law, the court's analysis has to begin with the federal law that creates the bankruptcy estate out of all the "legal and equitable interests of the debtor in property."

The discussion does not begin, or end, with whether the statute of limitations has begun to run on enforcing the legal interest.

11 U.S.C. § 541(a) states that "[t]he commencement of a case . . . creates an estate," the bankruptcy estate. That bankruptcy "estate is comprised of all . . . property, wherever located and by whomever held," including "all legal or equitable interests of the debtor in property **as of the commencement of the case**." 11 U.S.C. § 541(a)(1) (emphasis added).

Congress does not qualify or limit a debtor's legal interest based on whether the debtor did or did not know that she had a legal interest (a cause of action) or whether state law tolls the running of the statute of limitations on bringing suit to enforce such interests based on Debtor not being aware of such interests. *See, e.g.*, *In re Ross*, 548 B.R. 632, 641 (Bankr. E.D. N.Y. 2016) ("[A] debtor's lack of knowledge . . . of a cause of action is irrelevant for the purpose of determining ownership in a bankruptcy proceeding."), *aff'd Mendelsohn v. Ross*, 251 F. Supp. 3d 518 (E.D. N.Y. 2017).

Instead, Congress provides in 11 U.S.C. § 541(a)(1) that all legal interests existing at the case's commencement are part of the bankruptcy estate. *See, e.g.*, *Ozark Rest. Equip. Co. v. Anderson (In re Ozark Rest. Equip. Co.)*, 816 F.2d 1222, 1225 (8th Cir. 1987) (citing 4 COLLIER ON BANKRUPTCY § 541.10[1] (15th ed. 1986)) ("[Clearly,] causes of action belonging to the debtor at the commencement of the case are included within the definition of property of the estate.").

A legal interest that exists at the commencement of a case is one in which all of the elements for the cause of action are present. *See, e.g.*, *Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 709 (9th Cir. 1986) ("[R]egardless of whether a personal injury claim is transferable or assignable under state law, such claims become part of the bankruptcy estate under section 541."); *Claycomb v. Ulrich (In re Claycomb)*, 56 Fed. App'x 361 (9th Cir. 2003) (holding that appellant-debtor's choice not to file personal injury action until after bankruptcy was immaterial because the claim arose prepetition); *Juarez v. Suntrust Mortg., Inc.*, No. CV F 13-0485 LJO SAB , 2013 U.S. Dist. LEXIS 67850, at *19–21 (E.D. Cal. May 13, 2013) (finding that cause of action filed while bankruptcy case was pending was subject to the Chapter 7 trustee's exclusive right to pursue).

If a necessary element for the cause of action is missing at the commencement of the

1   bankruptcy case, though, then the cause of action (and any proceeds from it) is not property of the

2   estate. *See Sikirica v. Harber (In re Harber)*, 553 B.R. 522 (Bankr. W.D. Pa. 2016) (holding that

3   potential settlement payment from debtor's personal injury claim was not property of the estate

4   because, despite knowledge of a potential problem before the bankruptcy case, debtor did not

5   manifest injury, which was a necessary element of any such claim, until after the bankruptcy case

6   closed).

7   **A Debtor's Lack of Subjective Knowledge Of An Existing Claim**
8   **Does Not Prevent It From Becoming Property of the Bankruptcy Estate**

9        For Debtor's cause of action at issue to be property of the Bankruptcy Estate in this case, she

10  must have had a products liability claim (whether she knew it or not) as of the commencement of

11  this case.  In California, a products liability action based on strict liability follows the general rule

12  of the Third Restatement of Torts that "[o]ne engaged in the business of selling or otherwise

13  distributing products who sells or distributes a defective product is subject to liability for harm to

14  persons or property caused by the defect." 6 WITKIN, SUMMARY OF CAL. LAW (10th), Torts § 1430

15  (citing RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 1 (AM. LAW INST. 1998)).

16       Similarly, the products liability action could be based on a negligence theory—the plaintiff

17  does not need to elect for one theory over another. *See Jiminez v. Sears, Roebuck & Co.*, 482 P.2d

18  681 (Cal. 1971).  Like a strict liability action, a successful negligence action would have to show

19  that (1) plaintiff was injured by the product, (2) the injury occurred because the product was

20  defective, and (3) the defect existed when it left the defendant's control. 6 WITKIN, SUMMARY OF

21  CAL. LAW (10th), Torts § 1431 (citations omitted).

22       In her Declaration, Debtor states that she had a transvaginal mesh implanted on August 22,

23  2003. Dckt. 78 at 2:12–14.5.  After that surgery, she "had considerable pain and anguish." *Id.* at

24  2:16.  She underwent five additional prepetition surgeries "to remove and/or alleviate [the]

25  symptoms" caused by the transvaginal mesh. *Id.* at 2:17–18.  By Debtor's own statements, she was

26  injured by a product.  If that injury was caused because the device was defective, then it occurred

27  during the procedures "in the years 2003, 2004, and 2005." *Id.* at 2:18.  If the defects were in the

28  product, and if the product had not been altered since leaving manufacture's control, then the defects

existed when they left the manufacture's control prior to 2003.

All of the events were in place during the mid-2000s for Debtor to bring a cause of action based on products liability. Debtor had a prepetition claim, whether she realized it or whether she did not. Her asserted lack of knowledge did not stop the legal interest in a products liability lawsuit from existing.

**Review of Decision in *Mendelsohn* and Other Authorities**

Debtor directs the court to the decision of the District Court in *Mendelsohn v. Ross (In re Ross)*, 251 F. Supp. 3d 518 (E.D.N.Y. 2017), as determinatively showing that a debtor's lack of knowledge of a claim *per se* precludes such claim from being property of the Bankruptcy Estate. The District Court, hearing an appeal from the bankruptcy court, affirmed the bankruptcy court determination that the claim at issue was not property of that bankruptcy estate.

Given that Debtor, in large part, hangs her hat on *Mendelsohn* and an assertion that the New York Court concluded that the issuance of the 2011 FDA Update was determinative, this court detours slightly to consider such contention and explain why the analysis in *Mendelsohn* is not persuasively determinative.[6]  The facts and applicable law as stated by the District Court in *Mendelsohn* are summarized as follows.

Ross, the debtor in *Mendelsohn*, filed her bankruptcy case on November 23, 2004. She did not schedule any interest in a products liability claim or personal injury claim on her bankruptcy schedules. The bankruptcy court approved a settlement between Ross and the trustee for the estate's asserted rights in certain real property. This allowed for a 23% dividend paid to creditors with general unsecured claims in the bankruptcy case. Ross' bankruptcy case was closed on August 2, 2006.

In 2015, the trustee in Ross' bankruptcy case had the case reopened, asserting the right to

---

[6]  The short answer version of this explanation is that in *Mendelsohn*, the bankruptcy trustee and debtor agreed that there was no injury to debtor prepetition. Further, the existence of an injury was a necessary element of there being a claim. Therefore, there could have been no claim in existence at the time the case was filed for it to become property of the bankruptcy estate because there was no injury. In substance, it appears that the debtor in *Mendelsohn* was agreeing to settle any potential future claims which might arise, there being no actual injury upon which any present claim could have been based.

1  administer an undisclosed asset – a products liability claim for personal injury caused by the

2  prepetition medical procedure involving the implanting of a defective medical device (the same

3  Device as in the Motion now before the court). Ross asserted that she had the procedure in 1999,

4  was unaware of any claim when she filed bankruptcy in 2006, and did not learn of a possible claim

5  until after the 2011 FDA Update was issued. Thus, Ross asserted that no claim existed to be

6  property of the bankruptcy estate when her bankruptcy case was filed in 2005. However, as stated

7  in the *Mendelsohn* Decision, no such claims existed to become property of the estate. It was not

8  merely that Ross did not know of the existing claims when that bankruptcy case was filed.

9       The *Mendelsohn* decision begins with the assertion that, as a matter of federal law, the court

10  must determine whether such claim has "accrued"; citing *Osborne v. Tulis*, 594 Fed. App'x 39, 40

11  (2nd Cir. 2015), an unpublished opinion. *Osborne* cites to the published decision, *Chartschlaa v.*

12  *Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008). Interestingly, the word "accrued" or

13  "accrue" does not appear in the *Chartschlaa* decision.[7] The Second Circuit in *Chartschlaa* states,

14       Our analysis begins with 11 U.S.C. § 541(a)(1), which defines the bankruptcy estate
    as including "all legal or equitable interests of the debtor in property as of the

15       commencement of the case." "It would be hard to imagine language that would be
    more encompassing" than this broad definition. 4 Collier on Bankruptcy P 541.01

16       (15th ed. 2001). "**[E]very conceivable interest of the debtor, future,
    nonpossessory, contingent, speculative, and derivative, is within the reach of**

17       **§ 541.**" *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993). Contractual rights clearly
    fall within the reach of this section, see, e.g., *Cohen v. Drexel Burnham Lambert*

18       *Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 701 (Bankr.
    S.D. N.Y. 1992), as do causes of action owned by the debtor or arising from property

19       of the estate, *see Seward v. Devine*, 888 F.2d 957, 963 (2d Cir. 1989).

20  *Id.* at 122 (emphasis added).

21       The Second Circuit goes further in *Chartschlaa*, providing a discussion of when even post-

22  petition "acquired" property will be property of the bankruptcy estate if "it is 'sufficiently rooted

23  in the pre-bankruptcy past.'" *Id.*

24       Applying these principles in *Osborne*, the Second Circuit affirmed a decision that the claim

25  for malpractice by an attorney who failed to obtain an extension of the automatic stay in that

26

27       [7] It appears that the court in *Mendelsohn* conflates the word "accrues," which is the
    terminology used in the California Statute of limitations, with the word "acquires," as the later

28  word is used to describe when all of the necessary elements have occurred for someone to have
    obtained rights and a claim against another.

debtor's prior bankruptcy case was property of the of the bankruptcy estate in that debtor's subsequent bankruptcy case, notwithstanding that the actual sale of the home (and loss) did not occur until three months after the filing of the subsequent bankruptcy case. As stated by the court in *Osborne*, based on New York State Law, the claims for the malpractice had "accrued" (using that term to describe the elements necessary to create the rights, not when one begins computing the statute of limitations) when the legal malpractice mistake became irrevocable, not when the first foreseeable consequence occurred in the future. Nowhere in the *Osborne* decision are the words "statute of limitations" used or discussed.

Moving back to *Mendelsohn*, the District Court cites *Aetna Life & Casualty Co. v. Nelson*, 67 N.Y. 2d 169 (N.Y. 1986) for the state law proposition that, "Generally, "a right accrues when it comes into existence," . . . — *i.e.*, "when the plaintiff has a complete and present cause of action."" *Mendelsohn v. Ross*, 251 F. Supp. 3d at 521. The Court of Appeals of New York was addressing the issue in *Aetna Life & Casualty Co. v. Nelson* whether the statute of limitations had expired and prevented Aetna Life & Casualty Co. from enforcing a statutory lien to recover from an insured excess payments under the no fault insurance policy. Citing to New York Law, the New York Court of Appeals stated,

> The Statute of Limitations begins to run once a cause of action accrues (CPLR 203 [a]), that is, when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court (1 Weinstein-Korn-Miller, NY Civ Prac para. 201.02, at 2-9; *City of New York v State of New York*, 40 NY2d 659, 668). Thus the question is not when the lien first attached, or when the insurer could have established the lien (cf. *Biette v Baxter*, 57 NY2d 698) but when the insurance company first had the opportunity to enforce or foreclose the lien and actually recover from the defendants the amounts it had previously paid them as first-party benefits under the No-Fault Law.

*Id.* at 174. The New York court concluded that Aetna's right to enforce its rights did not come into existence until the insured received the double payment from the other source, not merely that it obtained a judgment against the other person.

The court in *Mendelson* then relies upon the agreement of the bankruptcy trustee and Ross that "the parties **do not dispute** that the claim [of Ross] **did not accrue prepetition** because appellee **[Ross] did not sustain an injury**, as required in product liability claims." *Mendelsohn v. Ross*, 251 F. Supp. 3d at 522 (emphasis added). The court in Mendelsohn further states,

As the Bankruptcy Court noted, this case presents a somewhat novel question in this Circuit: in a situation in which a debtor receives proceeds of a settlement where, because **the underlying facts do not establish all the elements of the potential legal basis for suit**, she may not ever be able to successfully bring suit, . . . .

*Id.* at 523. That court then further clearly shows that this is not merely a *debtor says she didn't know so the estate does not acquire the claim under 11 U.S.C. § 541* ruling, but one in which:

a.  " the underlying facts **do not establish all the elements** of the potential **legal basis** for suit;"

b.  Ross "may not ever be able to successfully bring suit;"

c.  " it was not inevitable that debtor's claim in the instant case would have ever accrued [stating that until there was an injury, there could be no claim];"

d.  the **bankruptcy court assumed that there was no injury**; and

e.  Ross' "past did not create an interest that manifested itself in the settlement agreement."

*Id.* at 526 (emphasis added).

In *Mendelsohn*, the real point of determination is the agreement between the trustee and Ross that there were no prepetition injuries upon which a claim could be based. *Id.* at 522. Possibly, Ross would never have suffered any physical injuries or aliments from the Device. Possibly, the only injury to be suffered by Ross was the potential future psychological harm - the worry of possible future problems when Ross learned post-petition of the possible injuries she could (but had not yet) suffer.[8]  In *Mendelsohn*, Ross was electing to settle her possible future claims for the post-

---

[8] The court in *Mendelsohn* considers, notwithstanding there being no injury and no claim that could have existed as of the commencement of the *Ross* bankruptcy case, whether the claim was so sufficiently rooted in past event that it would be property of the estate.  That court stated:

Here, appellee's pre-bankruptcy past did not create an interest that manifested itself in the settlement agreement. Instead, it was the **combination of an event that occurred in her pre-bankruptcy past** (the implantation of the medical device) **and certain post-bankruptcy events** (the FDA issued an advisory opinion regarding possible defects with the medical device; appellee became aware of the possible defects) **that created the interest that resulted in the settlement proceeds**. Without the post-bankruptcy events, **the pre-bankruptcy event would be rendered meaningless insofar as plaintiff's ability to obtain settlement proceeds** is concerned. Thus, under the particular facts of this case, it

petition payment. While the Device was implanted prepetition, there were no prepetition injuries upon which a claim could be based under New York Law. That necessary element of any potential tort claim missing, there were no claims or rights for the bankruptcy estate upon the commencement of the bankruptcy case by Ross.

**Additional Authorities For Determining
Property of the Bankruptcy Estate**

In considering the proper application of the principles enunciated by the Supreme Court in *Segal* and the broad scope of 11 U.S.C. § 541 as enacted by Congress, the District Court in *Mendelsohn*, Footnote 8, favorably cites to the Fifth Circuit decision *In re Burgess*, 438 F.3d 493 (5th Cir. 2006), concluding that a post-petition legislatively created right (which did not exist prepetition) was not a prepetition right of the debtor to be property of the estate. However, in reaching its determination in *Burgess*, the Fifth Circuit states:

> Thus, the scope of 541 is broad: that section brings into the estate all of the debtor's legal and equitable interests 'wherever located and by whomever held.' 541(a)(1). However, **the Code also provides a temporal limitation: property of the estate is determined at 'the commencement of the case.'** *Id.* The case is commenced, and the estate created, when the bankruptcy petition is filed. See *State Farm Life Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 795 (5th Cir. 1997); 5 COLLIER ON BANKRUPTCY 541.02 (15th ed. rev. 2005). Section 541's temporal limitation is the key to deciding this case.

*Burgess v. Sikes (In re Burgess)*, 438 F.3d 493, 496 (5th Cir. 2006) (emphasis added). The Fifth

---

> simply cannot be said that her interest was "sufficiently rooted in the
> pre-bankruptcy past" to render the settlement proceeds property of the bankruptcy
> estate.

*Id.* at 525-526 (emphasis added). Here the "knowledge" of the "possible" future "injury" that might possibly manifest itself was the basis for Ross' claim in *Mendelsohn* - there being no injury which had occurred or manifested itself as of the bankruptcy filing or even at the time of the settlement upon which any prepetition claim could be based. Ross was settling her possible future injuries that might occur, and the worry that such future injuries might occur, at which time a future claim would arise.

For the claims now before this court, the evidence clearly shows that substantial injuries were suffered by Debtor prepetition. The Debtor acquired the prepetition claim which became property of the bankruptcy estate. Debtor now seeks to recover the damages for the prepetition injuries exclusively for herself.

Circuit Decision in *Burgess* states that in enacting the Bankruptcy Code Congress made the

determination of property of the estate simpler than the "rooted in prepetition past" stated in *Segal v.*

*Rochelle*, 382 U.S. 375, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966). The Fifth Circuit concluded that

Congress has swept "[a]ll property in which the debtor has a 'legal or equitable interest' at the time

of bankruptcy [into] the [bankruptcy] estate." *Burgess v. Sikes*, 438 F. 3d at 499, quoting *Goff v.*

*Taylor*, 706 F.2d 574, 578 (5th Cir. 1983). The court in *Burgess* concluded:

> Thus, under current law, a debtor's interest in property may be contingent or
> enjoyment of the interest may be postponed until after bankruptcy, **but the debtor**
> **must have had a prepetition legal interest** nonetheless.
>
> Second, *Segal* is distinguishable because the debtor did have a prepetition legal
> interest in that case. . .
>
> Here, by contrast, Burgess suffered the crop loss before filing for bankruptcy, **but**
> **he did not have a prepetition claim to, or interest in, the disaster-relief payment**
> **because the legislation authorizing the payment had not yet been enacted**. If
> Burgess had no right or interest that constituted property within the meaning of
> 541(a)(1) at the commencement of the case, then the payment he later received
> cannot be proceeds of property of the estate under 541(a)(6).
> . . .
> In this case, at the time of filing, **Burgess had only a mere hope** that
> **crop-disaster-relief legislation would be enacted**. "This sort of **nebulous**
> **possibility is not property**." *Schmitz*, 270 F.3d at 1257. Were the law otherwise,
> any postpetition legislation or contract could retroactively create property of the
> estate. That cannot be the law; 541 clearly states that a bankruptcy estate is
> established at "the commencement of [the] case." Thus, **Burgess had no interest,**
> **contingent or otherwise, in the disaster-relief payment when he filed his**
> **bankruptcy petition.**

*Id.*, 499, 503 (emphasis added).

     *Mendelsohn* is consistent with *Burgess* in light of the agreement of that trustee and Ross that

no injuries existed prepetition, the agreement that the existence of a prepetition injury was a

necessary element of there being any claim in existence as of the commencement of the case (not

merely Ross not realizing that her medical problems were the prepetition injury caused by the

Device), and the agreement that there was no prepetition claim for the Ross bankruptcy estate.

**"Accrual" and the Delay of Discovery Doctrine**

     The parties have argued about, and become distracted by, the word "accrual" and the effect

of the discovery rule on delaying "accrual," as well as any effect those may have on the running of

the statute of limitations for a products liability claim. *See* Dckt. 75, 87, 94. Their arguments

1  conflate the term "accrual," as it applies procedurally to when the statute of limitations runs, with

2  whether Debtor has "acquired" rights that can be enforced against a third-party. As discussed

3  below, California law provides for the tolling of the temporal limit (the statute of limitations) on

4  when a person may file a complaint asserting rights against a third-party.

5       The Debtor's argument focuses on California Code of Civil Procedure § 312, dealing with

6  the procedure for filing complaints and asserting rights, not the elements for, or the existence of, a

7  claim against another person. California Code of Civil Procedure § 312 merely states that an action

8  can be commenced only within the statutorily limited procedural time period after which a cause of

9  action has "accrued" (not defining accrued), unless a statute provides that there is a different time

10  notwithstanding the "accrual" of the claim. This rule does not address when a person has acquired

11  rights or when all of the necessary elements exist for the person to have rights against another, but

12  merely the timing for when that person may have access to the courts to try and enforce those rights.

13       In California, a cause of action (here asserted by the Trustee to be an interest included in the

14  Bankruptcy Estate pursuant to 11 U.S.C. § 541) is subject to a statute of limitations, which does "not

15  begin to run until a cause of action accrues." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797,

16  806 (Cal. 2005) (citing *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 487 ( Cal. 1996)). Accrual,

17  for purposes of the statute of limitations affirmative defense, generally happens for a cause of action

18  at "the time when the cause of action is complete with all of its elements." *Norgart v. Upjohn Co.*,

19  21 Cal. 4th at 397. Thus "accrual," for statute of limitations purposes, generally occurs when the

20  "liability arises," the time when the rights and cause of action come into existence, which "liability"

21  is not dependent on "accrual" for purposes of the statute of limitation. *Id.*

22       While California Code of Civil Procedure § 312 states that "[c]ivil actions, without

23  exception, can only be commenced within the [statute of limitations], after the cause of action shall

24  have accrued," there is an exception to the accrual rule for computing the statute of limitations,

25  which exception is known as the "Delayed Discovery Rule." The Delayed Discovery Rule

26  "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the

27  [already existing] cause of action." *Fox*, 35 Cal. 4th at 807 (emphasis added) (citing *Norgart*, 21 Cal.

28  4th at 397; *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176, 187 (Cal. 1971)). In

*Fox*, the California Supreme Court distinguishes between when the rights and claims come into existence ("acquired") and when the statute of limitations (accrues and) applies as an affirmative defense to a person asserting "stale" claims. *See id.* at 806.

For purposes of determining whether the statute of limitations has begun to run and the clock ticking down on the deadline for a complaint to be filed for a claim based on an existing right, the court looks at whether a plaintiff had "reason to at least suspect that a type of wrongdoing has injured [her]." *Id.* To invoke the Delayed Discovery Rule and delay the statute of limitations from running,

> [a] potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light.

*Id.* at 808–09. As is clear, for the Delayed Discovery Rule to apply, all of the elements necessary for a claim must exist and the rights already acquired. The question then becomes for such claim and rights that already exist and acquired, whether:

(1) the (procedural) statute of limitations begins running (accrues) from the time the rights came into existence; or

(2) the time period is tolled from the time the rights come into existence (acquired) and the running of the (procedural) statute of limitations is delayed.

This distinction between the claim and substantive rights coming into existence ("acquired"), and the "accrual" for the statute of limitations computation is noted in WITKIN, CALIFORNIA PROCEDURE, which states:

§ 432 Statute Affects Remedy Only.

(1) Statement of Principle. A **statute of limitations is procedural**; it affects the remedy only, **not the substantive right or obligation**. (See *Chase Sec. Corp. v. Donaldson* (1945) 325 U.S. 304, 65 S.Ct. 1137, 1143, 89 L.Ed. 1628, 1636, infra, § 460; *Mitchell v. Automobile Owners Indem. Underwriters* (1941) 19 C.2d 1, 4, 118 P.2d 815; *Mudd v. McColgan* (1947) 30 C.2d 463, 467, 183 P.2d 10, infra, § 458; *Piazza Properties, Ltd. v. Department of Motor Vehicles* (1977) 71 C.A.3d 622, 628, 138 C.R. 357, citing the text; *Nelson v. Flintkote Co.* (1985) 172 C.A.3d 727, 733, 218 C.R. 562, citing the text; 63 Harv. L. Rev. 1186; 70 Harv. L. Rev. 1471; 27 Hastings L. J. 1 [Interest Analysis and Conflicts Between Statutes of Limitation]; 94 A.L.R.3d 533 [whether running of statute of limitations on action is bar to arbitration of dispute]; 51 Am.Jur.2d (2000 ed.), Limitation of Actions §§ 22, 25 et seq.)

3 WITKIN, CALIFORNIA PROCEDURE 5TH ACTIONS § 432 (emphasis added).

The application of the Delayed Discovery Rule, and the delay of the "accrual" as that term is used in the California Code of Civil Procedure, does not determine whether the interest of the Debtor (the rights against the third-party) exist, just that the (procedural) statute of limitations would not begin to run until the Debtor and her Bankruptcy Estate knew of the pre-existing rights. The "accrual" does not destroy or constitute a novation of the rights subject to a condition subsequent. Neither party has directed the court to any statute which would delay Debtor having acquired the rights, only legal principles that the (procedural) statute of limitations would not begin to run under the Delayed Discovery Rule.

**The Claims of Debtor and Class Action Settlement Proceeds**
**Are Property of the Bankruptcy Estate**

Contrasted to the debtor in *Mendelsohn* for which there was no prepetition injury, Debtor now before the court has claims and product liability rights not merely "rooted" in the prepetition period, but which germinated, sprouted, grew, blossomed, and became anchored prepetition. Debtor had, and the Bankruptcy Estate acquired, the products liability claim that existed prepetition.

The Bankruptcy Code requires only that the legal interest existed at the commencement of the case. 11 U.S.C. § 541(a). The court has noted that all of the essential elements for a successful products liability case existed for Debtor during the mid-2000s. Debtor may not have realized that she had a valid claim, but the claim (the legal interest) existed nonetheless. That she did not act upon her claim until after this case had closed initially does not prevent her prepetition claim and rights, and the Class Action Settlement Proceeds thereof, from being part of the Estate.

The court determines and shall issue a judgment (order form, Fed. R. Civ. P. 54(a), Fed. R. Bankr. P. 7054, 9014):

    A.    Determining that the claims and rights of the Debtor described on Amended Schedule B as "Mesh implant procedure personal injury claim" which form the basis for the Class Action Settlement and the Class Action Settlement Proceeds thereon are property of the Bankruptcy Estate in this case;

    B.    Holding that such determination that the claims, rights, and Class Action Settlement

Proceeds are property of the Bankruptcy Estate in this case is without prejudice to Debtor's right to claim an exemption therein pursuant to 11 U.S.C. § 522(b) or the Trustee's right to file an objection or other action related thereto.

This Memorandum Opinion and Decision constitutes the court's findings of fact and conclusions of law. Fed. R. Civ. P. 52, and Fed. R. Bankr. P. 7052, 9014. The court shall issue a separate order consistent with this Decision.

**Dated:** June 06, 2018

**By the Court**

Ronald H. Sargis, Judge
United States Bankruptcy Court

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked _____, via the U.S. mail.

| **Debtor**(s) | **Attorney for the Debtor**(s) (if any) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | Office of the U.S. Trustee<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |
| Steven S. Altman<br>1127 12th Street, Ste. 104<br>Modesto, CA 95354 | |